WILLIAM W. MITCHELL AND AUSTIN W. MITCHELL v.
THE ST. PAUL GERMAN FIRE INSURANCE COMPANY.

*Fire insurance—Michigan standard policy—Measure of damages.*

Under the Michigan standard fire insurance policy, which limits
the liability of the insurer in case of a total loss to what it
would *then* cost the insured to replace the insured property
with material of like kind and quality, the insured can recover
the market value of the property at the date of the fire.

So *held*, where the property was lumber, and the insured were
the owners, at the time of the fire, of standing timber, from
which could be taken a sufficient quantity, of like kind and
quality as that from which the lumber was manufactured, to
replace the same, and from which timber the insured contin-
ued to manufacture lumber after the fire.

Error to Wexford. (Aldrich, J.) Argued June 22
and 23, 1892. Decided July 28, 1892.

*Assumpsit.* Defendant brings error. Affirmed. The
facts are stated in the opinion.

*Norris & Norris,* for appellant.

*J. B. Judkins (Uhl & Crane,* of counsel), for
plaintiffs.

LONG, J. The plaintiffs in 1891 were partners, engaged
in the manufacture and sale of lumber at Crooked Lake,
Mecosta county. On July 8 of that year they owned and
had piled on their yards over 15,000,000 feet of lum-
ber, pickets, lath, and shingles, of the value of $176,000
and upwards. They were insured in several insurance
companies to the amount of $133,500. The policies were
all concurrent. The policy in the defendant company
was for the sum of $2,000. On the above date this entire
lot of lumber, pickets, lath, and shingles was destroyed

by fire. Proofs of the loss were duly furnished to all
the companies. No question was raised by any of the
companies but that the loss was an honest one, and that
there was a total destruction of the property. The only
contention in the case arises upon the construction of
certain clauses in the policies, and, a controversy having
arisen over this subject, a stipulation was entered into
between all of the insurance companies and the plaintiffs,
by the terms of which 75 per cent. of the amount of
each policy excepting that issued by the defendant, was
to be paid, and was paid, to the plaintiffs. This suit is
brought for a settlement of that question, as a test suit,
and by which, under the stipulation, all of the companies
agree to be bound. The court below directed the verdict
in favor of the plaintiffs for the full amount of the
policy in controversy here, with interest, and judgment
was entered for the plaintiffs.

Each policy is what is known as a "Michigan Stand-
ard" policy. The clauses of the policy necessary to a
consideration of the questions raised are as follows:

"*Four-fifths clause.* It is part of the consideration of
this policy, and the basis upon which the rate of premium
is fixed, that the assured shall maintain insurance on the
property hereby insured by this policy, to the extent of
four-fifths of the actual cash value thereof, and that, fail-
ing so to do, the assured shall be a co-insurer to the ex-
tent of such deficit, and in that event shall bear his, her,
or their proportion of any loss. It is, however, mutually
understood and agreed that, in case the total insurance
shall exceed four-fifths of the whole actual cash value of
the property insured by this policy, the assured shall not
recover from this company more than his *pro rata* share
of four-fifths of the whole actual cash value of such
property."

"This company shall not be liable beyond the actual
cash value of the property at the time any loss or dam-
age occurs, and the loss or damage shall be ascertained
or estimated according to such actual cash value, with
proper deduction for depreciation, however caused, and

shall in no event exceed what it would then cost the in-
sured to repair or replace the same with material of like
kind and quality. Said ascertainment or estimate shall
be made by the insured and this company, or, if they
differ, then by appraisers, as hereinafter provided; and
the amount of loss or damage having been thus deter-
mined, the sum for which this company is liable pursu-
ant to this policy shall be payable sixty days after due
notice, ascertainment, estimate, and satisfactory proof of
the loss have been received by this company in accord-
ance with the terms of this policy. It shall be optional,
however, with this company to take all or any part of
the articles at such ascertained or appraised value, and
also to repair, rebuild, or replace the property lost or
damaged with other of like kind and quality, within a
reasonable time on giving notice, within thirty days after
the receipt of the proof herein required, of its intention
so to do, but there can be no abandonment to this com-
pany of the property described."

It appeared upon the trial that the plaintiffs had man-
ufactured the lumber destroyed at their own mill, which
was situated at the yards where the lumber was piled,
and that they continued to operate their mill after the
fire occurred; also that they were the owners of a large
quantity of pine timber standing and growing upon lands,
from which could be taken a sufficient quantity of like
kind and quality to replace that destroyed by the fire.
It was also shown by the defendant upon the trial what
the value of this pine timber standing and growing was
at the time the fire occurred, and what it would cost to
cut, haul, manufacture, and pile on the yards, lumber,
etc., of like kind and quality, to the amount of that
destroyed. The plaintiff's testimony showed that the
average value per M. feet of lumber destroyed, including
lath, pickets, and shingles, was $10.64. Defendant's
counsel contended in the court below that, by the terms
of the policy above set forth, the plaintiffs being the
owners of this standing pine, and operating a mill at
which the same could be manufactured into lumber by

them of like kind and quality as that destroyed, their loss-damage would not exceed what it would cost the plaintiffs to replace the lumber by cutting from their own land and manufacturing it at their own mill; and that, so estimating their loss-damage, the cost of replacing it would be $3.65 less per M. feet than the actual cash value of the lumber upon the yards. It is further contended by defendant's counsel that this rule must prevail from the fact that the plaintiffs, after their loss, continued to cut from their lands to operate their mill.

Defendant's counsel claim that the Michigan standard policies provide a particular mode of ascertaining the damages in each particular instance, and that in this case the company contracted to *pro rata* indemnify the plaintiffs in accordance with their own particular surroundings; that is, that the plaintiffs having the timber to cut from, and the mill to cut it with, the loss-damage would be only such as it would actually cost the plaintiffs to replace the burned lumber by cutting from their own land by their own mill, and that these facts have a bearing upon the construction of the contract. It is conceded that if the plaintiffs had no timber to cut from, and no mill to cut it with, then the only way in which the loss-damage could be ascertained would be the market value at the time of the fire.

Counsel for defendant have in their brief entered into a very learned discussion of the terms of the policy to show that the word "then," used in the clause, "and shall in no event exceed what it would *then* cost the insured to repair or replace the same with material of like kind and quality," should not be read as calling for an immediate reproduction of the lumber burned, as it would not be possible, even by purchase in open market, in the State of Michigan, to replace it, and that such a contingency was not in the minds of the parties at the time

of entering into the contract; that the words "cost the insured" should not be read with "the insured" omitted, and that what it might *then* cost the insured to replace it would be different for an insured having no stumpage to replace with, and who must buy in general market; that the business of indemnifying each individual is different,—different in moral and physical hazard, and different in environment.

Counsel for defendant, referring to the case of *Chippewa Lumber Co. v. Phenix Ins. Co.*, 80 Mich. 116, also contend that the opinion of the Court in that case seems to regard "replacing" and "reproducing" as synonymous words. In that case the policy expressly provided that "the measure of damage shall in no case exceed the actual cost of producing the same." It was held that the measure of damages fixed by the parties was not to exceed the actual cost of producing the lumber destroyed. It was said:

"If plaintiff bought the logs, the measure of damages would be the price paid, with interest from date of purchase, and cost of manufacture and storing. If it purchased the stumpage, the measure would be the price of the stumpage, with interest and the other costs added. If it owned the lands from which the logs were cut, the measure would be the fair value of the stumpage, with the other costs added, and interest."

The case was decided upon the language of that contract, and the cost of producing the lumber destroyed held to be the measure of damages. The contract of insurance in that case entirely excluded the idea of indemnity for profits in case of loss, and the true measure was fixed by the contract at the cost of producing.

That contract is not synonymous with the terms employed in the present policy; that is, "what it would then cost the insured to replace it with like kind and quality." We think the word "then" is significant, and

must be given weight in determining the true intent and meaning of the contract. If the defendant's theory of construction be adopted, the word "then" must be dropped out, and the contract construed as intending to give to the insurance company the benefit of the time it would take the insured to replace it or reproduce it; that is, if the insured had the means of replacing or reproducing the burned lumber, having timber from which to manufacture lumber and the mill to manufacture it with, then an estimate should be made of that cost as the measure of damages, though it might take six months or a year to replace or reproduce it. In this sense the words "replace" and "reproduce" would be synonymous; but the contract cannot be construed in that way without doing violence to the language employed. Clearly, it means just what it says, "what it would then cost the insured to replace it," and not what it would cost the insured to cut from his own stumpage, manufacture lumber at his own mill, and replace, after the delay of cutting, hauling, sawing, piling in the yards, etc.

We are unable to agree with the learned counsel for the defendant that the contract is to be construed any differently in this case than though the plaintiffs had no stumpage of their own, and no mill by which they could manufacture lumber. It means that the plaintiffs had the right, on the date of the fire, to recover from the defendant such an amount of money as it would cost them to replace the lumber, or, in other words, the market value of the lumber at the date of the fire. It cannot be said that, because the lumber was so great in amount, it would have no market value, or that such a large amount could not have been purchased in open market. It is like any other commodity of which constant sales are being made. If it had been flour, it is not contended that, because the insured may

have had a farm and could raise the wheat, and a mill where he could manufacture it into flour, he could recover only what it would actually cost to raise the wheat and convert it into flour; but there would be as much reason to hold the contract controlled by such considerations in the one case as in the other. Lumber is a marketable commodity, and it is well known can be purchased in the open market as well as flour. Certain grades have certain prices, and grades of lumber are as well known to the trade as grades of wheat. We know of no reason for saying that fifteen or sixteen million feet of lumber cannot be purchased in open market, or that it has not as certain and fixed market value as a thousand or five thousand bushels of wheat.

It cannot be said that it was in the contemplation of the parties, at the time the contract was entered into, that it was to have the construction now contended for by counsel for the defendant. Suppose plaintiffs had sold their timber and removed their mill before the fire, which they would have had the right to do. The contingency would then have arisen where they could not have reproduced the lumber. It would then be conceded that the measure of loss-damage would be the cost of replacing it by purchase in the open market. If the contract bore the construction contended for at its execution, under the circumstances above supposed, it would be changed by the change in the situation and surroundings of the insured. It would be construed in one way at its inception, and by a change of circumstances be susceptible of another construction at the time of the fire.

It certainly was not the intent of the Legislature, by Act No. 149, Laws of 1881, to provide the means by which such a policy as that contended for by defendant's counsel could be adopted into this State as a standard. The act itself provides that it shall be such a policy as shall

accomplish, among other things, brevity and simplicity, the avoidance of technical words and phrases, a fairness and equity between the insurers and the insured. If the doctrine contended for is to prevail, that simplicity which was intended is not established by the policy, nor is there any fairness and equity in having a form of policy that shall mean one thing to one class of insured, and another thing to another class; or a policy that may mean one thing at the time of entering into the contract, and a different meaning may attach to the same language if the *status* of the insured shall be changed. The commission appointed by the act of 1881 fixed the date when the standard policy should have force as July 1, 1889, and the form used in the present case was in accordance with this standard. It could not have been intended, being a standard policy, that its terms should be varied according to different circumstances which might surround the insured. It is not ambiguous, but plain and simple in its language, meaning the same thing when applied to one who is in a situation in which it would be impossible for him to reproduce the stock burned as though he were in a position to reproduce it. It is not like that in the case *Chippewa Lumber Co. v. Phenix Ins. Co., supra.* There the loss-damage was limited to the cost of production by the contract; here it is not so limited, but is limited to the cost of then replacing it,— that is, replacing it at the time of the fire.

The court below was not in error in directing verdict and judgment for the plaintiffs for the full amount of the policy.

Judgment must be affirmed, with costs.

MORSE, C. J., McGRATH and GRANT, JJ., concurred. MONTGOMERY, J., did not sit.